**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2827-19

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

v.

IZAIA M. BULLOCK,

    Defendant-Respondent.

_____

> Argued March 8, 2021 – Decided August 5, 2021
>
> Before Judges Currier, Gooden Brown and DeAlmeida.
>
> On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 19-02-0380.
>
> Patrick F. Galdieri, II, Assistant Prosecutor, argued the cause for appellant (Yolanda Ciccone, Middlesex County Prosecutor, attorney; Patrick F. Galdieri, II, of counsel and on the brief).
>
> Michele E. Friedman, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney; Michele E. Friedman, of counsel and on the brief).

PER CURIAM

By leave granted, the State appeals from the February 4, 2020 Law Division order granting defendant's motion to suppress statements made to police in violation of Miranda[1] as well as physical evidence seized from the search of his cell phone and vehicle after he signed consent to search forms. For the reasons that follow, we affirm in part and reverse in part.

I.

On February 21, 2019, defendant was charged in a Middlesex County indictment with two counts of first-degree attempted murder, N.J.S.A. 2C:5-1(a)(3) and 2C:11-3(a)(1) (count one and two); and two counts of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and 2C:11-3(a)(1) (counts three and four).[2] The charges stemmed from comments defendant allegedly made to a fellow Rutgers University football player detailing his plans to kill his girlfriend's parents and soliciting the teammate's aid to commit the crimes.

Pre-trial, on May 12, 2019, defendant moved to suppress his statements to police on the ground that he "did not knowingly, voluntarily and intelligently

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

[2] Defendant was also charged in a separate Middlesex County indictment with fourth-degree cyber harassment, N.J.S.A. 2C:33-4.1(a)(2), but that indictment is not part of this appeal.

waive [his] <u>Miranda</u> rights" when he was questioned by members of the Rutgers University Police Department the night of October 29 into the early morning hours of October 30, 2018.  Defendant also moved to suppress items seized from his car and cell phone on the ground that his consent to search was invalid.  At a suppression hearing conducted on February 4, 2020, the State produced two witnesses, Peter Archibald, a former Rutgers University police officer, and Lauren Tredo, a former Rutgers University detective.  Although Archibald and Tredo had since left the Department, they were members of the Department when the incident occurred.  The State also introduced various exhibits, including Archibald's body cam footage which recorded his entire encounter with defendant and the video recorded statements taken by Tredo at police headquarters, all of which were viewed by the motion judge during the hearing.

Archibald testified that at approximately 8:30 p.m. on October 29, 2018, he was dispatched to a dormitory on the Rutgers University campus in Piscataway to interview a witness about threats made by defendant to harm his girlfriend's parents.  The witness reportedly had a recording of defendant's statement.  While responding to the building with two other patrol officers, Archibald received another dispatch that students in the same building "overheard someone making a statement" about "harming someone's parents"

and were concerned for their own safety. As a result, upon arrival, the officers split up, with Archibald going to the original witness' room near the lounge on the first floor and the other officers attempting to locate the subsequent callers.

When Archibald approached the witness' room, he observed defendant "standing in the hallway outside the witness' room." Archibald recognized defendant from "[their] in house student photos" and "his DMV photo." Archibald announced his presence, obtained confirmatory identification from defendant, and escorted defendant to "the main courtyard in the . . . building, where [he] met [his] two partners." During the interaction in the courtyard, which lasted a total of approximately ten minutes, defendant was surrounded by all three officers and the encounter was captured on Archibald's "body-worn camera."

On the footage from Archibald's body camera, Archibald initially told defendant that "some concern[s] . . . have been raised" to which defendant responded "I know." Upon further questioning, defendant told Archibald that he was "a [j]unior" and "a linebacker" on the Rutgers University football team. Archibald then told defendant that the police were involved because "something was said," and several people who "heard the comment" would be interviewed. When Archibald specifically asked defendant why the police were there,

defendant replied "[b]ecause I made a statement." When probed about the content of the statement, defendant responded that he said he "want[ed] to harm someone." When asked "[w]ho," defendant replied "[m]y girlfriend and her family" but added that he "was stressed out earlier in the day" when the statement was made.

Despite probing, defendant was resistant to disclosing his girlfriend's name. Archibald informed defendant that they "ha[d] to investigate what was said," that "this ha[d] gone way above [their] head[s]," and that he "ha[d] to follow . . . procedure" and "ask . . . a bunch of questions." In response, defendant eventually disclosed his girlfriend's name, age, and address. Defendant told Archibald that they had been dating for "[a]pproximately three years," but she was not a Rutgers student. At that point, Archibald told defendant that he was "not under arrest" and he was "not in trouble." Nonetheless, Archibald verbally advised defendant of his <u>Miranda</u> rights, explaining that he had the right to remain silent, that anything he said would be used against him in a court of law, that he had the right to an attorney, that an attorney would be appointed if he could not afford one, and that he had the right at any time to not answer any questions or make any statements. When Archibald asked defendant if he understood his rights, defendant did not provide an audible response.

A-2827-19

Next, Archibald asked defendant exactly what he had said, to whom he had said it, and why he had said it. Defendant ultimately admitted that he said "[he] would kill [his] girlfriend's parents." Defendant stated he "was speaking to Micah Clark" "in the wide receiver's room" at the Hill Stadium "earlier" in the day and told him he "want[ed] to do this." Defendant explained that at the time, he and his girlfriend, whom he had not seen for about a week, were "going through . . . a break up," he was "extremely" "frustrated" and "stressed," and "[t]here was a lot on [his] mind." However, after he "had a conversation" with "[his] psychiatrist," he "felt completely different," and he was "not going" to harm anyone.

At that point, defendant was transported without incident in a patrol car to police headquarters. Defendant was patted down before entering the police car and his cell phone was confiscated but he was not handcuffed. Defendant arrived at headquarters at approximately 8:50 p.m. and was escorted to a room. Archibald testified that during the entire encounter, he did not make any threats or promises to defendant. He further averred that defendant did not appear to be under the influence of any drugs or alcohol and seemed to understand the English language as well as what was being said. Archibald candidly admitted that from the moment he encountered defendant in the hallway outside of Clark's

room, defendant was "[n]ot free to leave." Archibald further acknowledged that when he verbally advised defendant of his <u>Miranda</u> rights, "[he] did [not] ask [defendant] if he understood his rights, but [defendant] did acknowledge in the positive."[3]

At headquarters, Tredo, the on-call detective at the time, was called in to conduct the investigation. She testified that when she arrived at headquarters the night of October 29, 2018, before interrogating defendant, "[she] was briefed by the road sergeant" regarding defendant's admissions at the scene and interviewed "two witnesses [who were] waiting to speak with [her]," one of whom was Clark. Additionally, "[Tredo's] lieutenant had told [her] that the Chief of Police had received information from the football team that there was a voice memo with a football player . . . making statements about killing his girlfriend's parents."

Tredo stated that defendant's interview was conducted in an "audio and video [equipped] interview room within [the] Rutgers Detective Bureau" and the entire interview was recorded. <u>See</u> <u>R.</u> 3:17. According to Tredo, there were no conversations with defendant other than those captured on the recording. The

_____

[3] In fact, on the footage, Archibald did ask defendant whether he understood his rights but did not receive an audible response from defendant. Instead, defendant appeared to nod his head very slightly.

interview began at "around 12:45 a.m." the following morning, nearly four hours

after defendant had arrived at headquarters. During the interview, Tredo was

accompanied by Detective Sergeant Carlos Rodriguez.

In the video recorded interview, after introducing themselves, Tredo said

to defendant:

> So, since you're here . . . I have to read you your rights.
>
>      . . . .
>
> I know you spoke with officers prior. But we just have
> to do it again.
>
>      . . . .
>
> So, after each one, just acknowledge that you
> understand by saying yes or no, okay?[4]

Then, reading verbatim from a Rutgers Advisement of Constitutional

Rights form, Tredo told defendant: (1) that he had the right to remain silent; (2)

that anything he said could and would be used against him in a court of law; (3)

that he had the right to talk to a lawyer and have one present during questioning;

(4) that if he could not afford to hire a lawyer, one would be appointed to

---

[4] Our independent review of the record reveals disparities between the transcript
of the suppression hearing during which the recording was played in open court
and the actual video-recorded interrogation. We note, however, that the
disparities are not relevant to the issues raised on appeal.

8

represent him before any questioning; and (5) that he could exercise his rights at any time and not answer any questions or make any statements. After Tredo read each right, defendant responded affirmatively, indicating either "[c]orrect," "[t]rue," or "[y]eah."

Next, Tredo asked defendant to read the following waiver statement that appeared at the bottom of the form out loud:

> I have been advised of my rights, and I understand what my rights are. I will voluntarily speak with you and answer questions.

Once defendant complied, Tredo instructed defendant to "initial next to [each of the] five" rights on the form and "sign and date" below the waiver statement that he had just read. Again, defendant complied.

Tredo then proceeded to question defendant, telling him that he was there "because of comments [he] made" and asking if he could tell her "what[ was] going on with those comments" and "walk [her] through the whole incident." Over the next thirty minutes, defendant admitted that earlier in the day, between approximately 2:00 p.m. and 5:00 p.m., he made a comment to Micah Clark about killing his girlfriend's parents. Defendant stated that Clark was a teammate and they were inside the wide receiver's room at the Hill Center at the time. Defendant said that although he did not have "a blueprint on how [he was]

A-2827-19

going to [do it]," he told Clark he would "find a way to . . . drug her [mother]" and then "kill her father" by perhaps making it appear as if "he hung himself, or something of that nature." He told Clark he would "leave [his] cell phone home," so that "[his] location" could not be "pinpoint[ed]" by "cell tower[s]." He also planned to cover his feet with "bags" to avoid "footprint[s]." He solicited Clark to be his "getaway" driver and asked Clark if he "ha[d] a gun."

Defendant admitted to the detectives that to carry out his plan, he had "a pair of work gloves" that he kept "in [his] car at all times for . . . check[ing the] oil, and stuff like that." He also admitted that "at one point, [he] did have [a] bag . . . in [his] car" containing "crushed up" "Tylenol." However, earlier in the day, he had removed the bag from his car.

Defendant explained that he and his girlfriend of three years were "going through a situation currently" and "[he] was just stressed out." He stated that although they were "not together, . . . the love [was] still there." He said he and his girlfriend's parents did not "see eye to eye" and they objected to their relationship because he was "black" and she was "white." He believed that without their influence, he and his girlfriend could be together. According to defendant, although he was "forming a plan, . . . [he] did [not] see [himself]

A-2827-19

actually going through with this actual plan" and he was not "about to go harm anybody."

Defendant explained that after talking to Clark, he had an appointment with his psychiatrist because there were other things bothering him as well, including "financial" and "family problems." Although defendant did not "mention" the plan to kill his girlfriend's parents to his psychiatrist, he felt better after seeing him and was back to "normal." Defendant stated that after he met with his psychiatrist, his coach called him and said "he [had] heard something," but he assured his coach that "[he] didn't mean it." After talking to his coach, defendant headed to Clark's dorm room to talk to Clark again but encountered the police instead.

After the first thirty minutes of questioning, both detectives left the interview room. When they returned, Tredo told defendant she had a few more questions. During the second round of questioning, defendant told the detectives that he had only been to his girlfriend's parents' house "twice" and did not know the "layout of [the] house." However, he admitted that he "Googled" the house "on [his] phone" "[t]o see if there [were] . . . any cameras, or anything." Upon further questioning, defendant denied having anything else in his car "to do anything." Despite his denials, Rodriguez asked defendant if he would consent

11

to a search of his vehicle. Defendant replied "[y]eah[,] but[] I don't believe there's anything in there that you'd call evidence." Defendant added that it was "not even [his] car" but "[his] parents' car."

At that point, the detectives left the interview room again. When they returned carrying consent to search forms, Tredo asked defendant if he still understood his <u>Miranda</u> rights to which defendant replied, "I guess so." Thereafter, the following exchange occurred:

> [Tredo]: [S]peaking about the consent to search. So, this one is for the vehicle. So, basically, you have the right to be present during the search. Do you consent to search the vehicle or you can deny consent for the vehicle. If you do deny it, I can apply for a search warrant. I have to speak with the judge. It's not guaranteed or promised that I will get the search warrant. It's just one of my options.
>
> [Defendant]: Uh hum.
>
> [Tredo]: - - if you don't consent. So, that's up to you, if you want to read. . . through it. That's one of our options, either consent, or I could apply for a search warrant.
>
> [Defendant]: I'll talk to my parents about this first.
>
> [Tredo]: You going to talk to your parents first?
>
> [Defendant]: Yeah.
>
> [Tredo]: All right. And then, with the cell phone . . . . Since you did say that you were looking up . . . pictures,

A-2827-19

or evidence . . . on your cell phone, that's why we had to seize [it]. So, since it is seized, again, you're going to have the option to consent to a search, or I will again, apply for a search warrant. It's not promised or guaranteed I'll get it. But that is my option, where I will do a forensic examination on your phone.

[Defendant]: Yeah. You have to talk to my parents about all this.

[Tredo]: Well, not the phone. The phone is . . . your personal phone.

[Defendant]: That's true.

[Tredo]: So, same with the car. Technically, yes, they are the registered owner. But you said prior that you're the primary operator of it.

[Rodriguez]: You want to talk to your parents to see if you can give consent[?]

        . . . .

[Defendant]: I mean, yeah but, they're asleep. Currently, it's two o'clock in the morning.

[Rodriguez]: Okay. . . . [Y]ou always have the option to consent to it later.

[Defendant]: So, if I sign this, I can get my phone back and continue my day?

[Rodriguez]: No, no. The phone still has to get . . . checked. We still have to do forensic on the phone. It just takes longer for us to go through . . . .

13

After the detectives explained exactly what a forensic examination entailed and explained to defendant that his phone would not be returned to him immediately as the other officers had indicated, defendant said, "I guess" and asked for the pen to sign the consent form. Before Tredo allowed defendant to sign, she read the consent form to him to ensure that he understood it. The form stated that defendant has been informed of his

> constitutional rights, first, that [he] may require that a search warrant be obtained prior to any search being made; second, that [he] may refuse to consent to any search; third, that anything which may be found as a result of th[e] search . . . can and will be seized and used against [him] in a criminal prosecution; fourth, that [he] may revoke [his] consent to search at any time; fifth, that [he] may consult with anyone of [his] choosing before [he] make[s] decisions to waive [his] rights.

After the form was read, defendant asked what it meant that whatever was "found as a result of the search . . . [could] be used . . . against [him] in a criminal prosecution." Rodriguez explained that any evidence found on the phone pertaining to defendant's statement "could get [him] criminally prosecuted." Defendant queried "[s]o, I can go to jail for making comments" and Rodriguez replied that he could. Thereafter, defendant signed and dated the consent to search form for his phone and checked the box indicating that he waived his right to be present during the search. Notably, the form stated that "written

14

permission [was] given . . . voluntarily and without threats or promises of any kind." When Tredo asked whether he understood everything on the form, defendant responded affirmatively.

Returning to the discussion about the consent to search the vehicle, the following exchange occurred:

> [Tredo]: Okay. And then on the vehicle[], you don't want to consult with your parents?
>
> [Defendant]: Yeah. I'm not.
>
> [Rodriguez]: So, you're the primary operator of that vehicle?
>
> [Defendant]: Yes.
>
> [Rodriguez]: Okay. So, if you're the primary operator.
>
> [Defendant]: Where's the consent?
>
> [Tredo]: So, I don't want you to feel . . . rushed into this or forced into it. . . .
>
> [Rodriguez]: We're not forcing you.
>
> . . . .
>
> [Defendant]: Yeah, but it feels like I'm going to end up being here [fifteen] hours longer. And . . . I want to go home. I'm tired. . . .
>
> [Rodriguez]: Ok, so this is what I want you to know. If you want to consent to it, you can sign a consent. . . .

. . . .

[Defendant]: If I don't sign the consent, can I still leave?

. . . .

[Rodriguez]: Well, right now, you're not going anywhere.

Rodriguez explained that if defendant did not consent to the search of his vehicle, they would contact the prosecutor to determine how they would proceed. Defendant then asked, "[c]an I go home tonight, please?" Rodriguez replied "I'm not going to tell you whether you go home tonight or not. That's not . . . what we're talking about." Defendant queried "[i]f I do consent, . . . how am I going to get home?" Defendant added "I don't know how this works." After defendant reiterated that he was "not the owner," the following exchange ensued:

[Tredo]: [Y]ou said prior you did want to consult with your parents, which we can give you that option. But would that be now, or . . . later? . . . I want to give you the option because you expressed your concern that you want to speak with a parent.

[Rodriguez]: If you still want to speak to someone that's fine. If you don't, that['s] up to you. But, you have that opportunity if you want to.

[Defendant]: I just want to go home, man, like I said, I just want to go home.

16

[Rodriguez]:  You need a few minutes to think about it?

After about fifteen seconds of silence, defendant asked for the pen to sign the consent form.  Before allowing defendant to sign, Tredo said she wanted to make sure defendant understood, and Rodriguez asked defendant to read the form out loud.  Defendant complied and read the motor vehicle consent to search form, which mirrored the advisement of constitutional rights contained in the consent form executed in connection with the consent to search his phone.[5] Defendant asked for an explanation of the provision on the form stating "[c]onsent [g]ranted with signature [r]efused."  After Rodriguez explained that it simply meant that "[he] gave consent, but . . . didn't want to sign [the form]," defendant signed and dated the form, waiving his right to be present during the search.  Like the other form, the motor vehicle consent form stated that "written permission [was] given . . . voluntarily and without threats or promises of any kind."

After defendant returned the form to Tredo, Tredo asked defendant if he understood both forms, and defendant responded affirmatively.  Before the

---

[5]   The motor vehicle consent to search form did not contain the language contained in the cell phone consent to search form regarding the right to consult with anyone of his choosing before making a decision to waive his rights.

detectives left the interview room, defendant asked "[h]ow much longer . . . [it was] going to take?" Rodriguez replied he did not know and could not promise anything. When defendant asked "[h]ow long" they could "hold someone for an investigation," Rodriguez replied "[w]e haven't held you enough."

After leaving the interview room again, the detectives returned at "around 7:00 a.m." Before resuming the questioning, Rodriguez stated that he had to read defendant his rights and proceeded to read verbatim from the Rutgers Advisement of Constitutional Rights form as Tredo had previously done. After Rodriguez read each right, defendant responded affirmatively, indicating that he understood each right. Thereafter, Rodriguez told defendant to read the waiver statement "out loud," "initial next to each" of the five rights on the form, and sign and date the waiver statement. Once defendant complied, Rodriguez asked defendant about the conversation defendant had had with his coach when his coach had called him, after which the interview was concluded.

According to Tredo, during the course of the interview, defendant was never restrained, "was offered water," and was given the opportunity to use the bathroom. Tredo also averred that she did not make any threats or promises or offer any inducements to defendant. She testified that defendant did not appear to be "under the influence of any kind of drugs or alcohol," was a twenty-two-

year-old "junior . . . at Rutgers," spoke English, and appeared to understand his Miranda rights. Tredo further confirmed that at no point did defendant ask for an attorney or indicate he no longer wanted to make a statement. On cross-examination, Tredo acknowledged she did not inform defendant of the nature of the charges prior to interviewing him because at that time, she "did not know what charges were going to be brought against [him]."

Later that same day, on October 30, 2018, Tredo issued a complaint-warrant against defendant charging him with two counts of first-degree attempted murder and two counts of first-degree conspiracy to commit murder, occurring on or about October 29, 2018. The attempted murder charges alleged that defendant "acquir[ed] gloves, crush[ed] up Tylenol, possess[ed] a mask, look[ed] up the location of the victim[s'] residence and solicit[ed] the assistance of another in the commission of the crime[s] . . . ." The conspiracy to commit murder charges alleged that defendant "ask[ed] another to be the getaway driver and lookout." The affidavit of probable cause specified that defendant's video recorded interview, a search of defendant's vehicle, and an audio recording turned over to Rutgers police by a witness confirmed "defendant's plot."

Immediately following the suppression hearing, the judge granted defendant's motion to suppress his statements and the physical evidence seized

19

from the search of his phone and car, finding that the State failed to show a proper administration of the <u>Miranda</u> rights, a valid waiver of the rights, and a valid consent to search. In an oral decision, initially, the judge found that "the[] officers testified credibly." Nonetheless, regarding the statements, the judge found that "not one officer asked [defendant] the simple question, are you willing to waive your rights." Further, the judge determined that because defendant merely did "as he was told" and "initial[ed]" and "sign[ed]" the forms when they were "presented to him," his actions did not manifest a "clear" waiver of his rights. Thus, the State failed "to sustain [its] burden of proving beyond a reasonable doubt that [defendant's] rights were waived."[6]

Specifically addressing defendant's interaction with Officer Archibald, the judge posited that he must "consider whether . . . defendant was given his [Miranda] rights before being subjected to a custodial interrogation," whether "he waived those rights," and whether "the waiver was knowing, intelligent and voluntary[] in light of the totality of the circumstances." Relying on <u>State v. P.Z.</u>, 152 N.J. 86, 103 (1997), the judge noted that "the critical determinant of

---

[6] Based on the "sequence of events," the judge rejected defendant's argument that the detectives' failure to inform defendant of the crimes for which he was arrested vitiated defendant's ability to knowingly and intelligently waive his right against self-incrimination under <u>State v. A.G.D.</u>, 178 N.J. 56 (2003) and <u>State v. Vincenty</u>, 237 N.J. 122 (2019).

custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, and the status of the suspect."

In that regard, the judge noted that given Officer Archibald's knowledge that statements of a violent nature were attributed to defendant, when he encountered defendant at the dormitory, "Archibald had to have been, and was clearly on some level of alert" and "ultimately wind[ed] up outside on the courtyard" with defendant, at which point issues related to Miranda arose. The judge continued:

> What happens at that point, you see on the video, is [defendant] is in a situation where he's outside with Officer Archibald, and then the two other officers arrive on the scene. . . . [I]t's nighttime, approximately 8 p.m., maybe 8:30 upon arrival, and what you get is a situation where [defendant] . . . is standing . . . where he has basically his back up against the wall, or close to it, surrounded by three officers in full uniform. Officers who are armed. . . . At least two of them are visibly seen with their hands on their belts . . . .
>
> Clearly it's a situation where anybody who was observing objectively . . . clearly [would] feel that they are not going anywhere. To his credit, Officer Archibald indicated that [defendant] . . . really wasn't going anywhere, he was in custody, he was not free to leave. . . . [A]nd also taking into consideration that there was an unidentified male who happens to come

21

upon the scene who is cleared away by one of the officers, clearly showing anybody who is watching, and perhaps even [defendant], that this is really a situation where [defendant] is being isolated from everyone else, except for him and these three particular officers.

The judge concluded that because there was a significant deprivation of the defendant's freedom of action based on the objective circumstances, defendant was subjected to a custodial interrogation. Thus, the "incriminat[ing] responses" elicited by Archibald up to that point regarding the reason for the police presence were elicited in violation of Miranda and were therefore inadmissible. The judge added that although Archibald "decide[d] to Mirandize [defendant]" at that point, his statement that defendant was "not under arrest" belied the fact that anyone "watching the video could clearly see that [defendant was] in custody."

The judge then addressed the administration of Miranda warnings to defendant, finding that although "Officer Archibald Mirandize[d defendant],"

> at no point does he do the follow-up of asking [defendant] the next two most important questions. Do you understand your rights, and are you willing to waive your rights and answer our questions. And that is the key to [Miranda]. It's not just about reading the rights. It's about asking if you understand them, and whether you're willing to waive them and answer our questions. If you don't put that on the record, if you don't verify that, anything that happens after that in the way of question and answers, has to be suppressed,

because . . . the State is not able to prove beyond a reasonable doubt . . . that . . . defendant . . . waived his rights under [Miranda]. And that is clear on the video.

. . . .

So it is for that reason with regards to that conversation, I would be granting . . . defendant's motion to suppress those statements.

For the same reasons, the judge concluded that Detective Tredo's administration of Miranda rights "f[ell] short" and the State failed to prove "beyond a reasonable doubt that . . . defendant waived his rights under [Miranda]." In that regard, the judge explained:

Det. Tredo presents [defendant] with a waiver. Asks [defendant] to read the waiver. They go over the rights. She asks him to initial the rights. She asks him to read aloud the waiver. She asks him to . . . initial and sign and then proceeds to ask him questions. She herself doesn't ask him, do you understand those rights, and even more importantly, doesn't ask him are you willing to waive those rights and talk to us. . . . You need to do it. How else can you prove beyond a reasonable doubt that he waived those rights. . . . And . . . I understand why she did it, because she knew that [defendant] had spoken to Officer Archibald, arguably under the impression that Officer Archibald had Mirandized him and that he waived his rights and spoke to him. She even referenced prior to presenting him with the [Miranda] rights, that she gave to [defendant], his prior statements to the other officer. . . .

What she arguably did not know was that Officer Archibald did not ask [defendant], are you willing to

23

waive these rights and talk to us. He just himself proceeded to go ahead and ask these questions. And [Det.] Tredo did the exact same thing.

. . . .

Now, [defendant] is a college student, intelligent . . . . [N]o indication that he didn't understand at least those rights. No indication that he didn't understand what he was reading. But a waiver of [Miranda] rights in any of the case law that I have read, . . . you actually have to have two things in order to prove beyond a reasonable doubt . . . . Maybe even three if you break it down even further. Go over the rights with the individual, get confirmation that the individual understands the rights, and confirm that the individual is willing to waive those rights and speak and answer questions put to him.

In this case clearly [defendant] read the rights . . . because he said yes, and the officers went individually [through] each right[] with him. They presented him with the paper and said, read the waiver. That's what Det. Tredo did. . . . He read it out loud. And then she . . . took it from him and said, initial each right[] and sign here. And then went into the questioning. Never asked him, are you willing to waive your rights and answer the question.

[Defendant] just did what he was told. . . . Why he did it, maybe he's just disciplined to follow orders. You certainly have to follow orders if you're playing football and playing linebacker. . . . Maybe that's how he was raised by his parents. . . . I don't know. But for law enforcement, in order to prove that an individual has waived their [Miranda] rights under the case law, you at least have to prove beyond a reasonable doubt some way that this waiver was a free and unconstrained

24

choice.  And just asking an individual just to read the waiver out loud, and telling them to sign here, and proceed then to ask them questions, without asking him, are you waiving your rights and answering our questions, that doesn't cut it under the case law. . . .

Regarding Detective Rodriguez's administration of <u>Miranda</u> rights, which the judge determined suffered from the same defect, the judge stated:

> Unbelievably for the exact same reason, the third statement taken at 7 p.m. follows the same pattern, this time it's Det. Sgt. Rodriguez. . . .  Det. Sgt. Rodriguez . . . goes through the rights with . . . [defendant].  At this point we're talking about [defendant] who is in custody . . . [twelve] hours after . . . [his] first contact with Officer Archibald . . . .  He's tired. . . .

> But Det. Rodriguez doesn't do anything more . . . than Det. Tredo did. . . .  Have [defendant] read aloud . . . the waiver portion, sign . . . , and go right into the questions.  Not even asking the simple questions, are you willing to waive these rights -- are you willing to talk to us.  Don't even have to say waiving the rights, are you willing to answer questions.  Will you talk to us.  Say that and for me that's good.  I think that's passable for [<u>Miranda</u>] purposes under the case law.  But nobody asks him that question.

Turning to the consent to search the phone and the car, the judge determined that the State failed to prove "by clear and convincing evidence" that "consent [was] freely and voluntarily given."  The judge found it unacceptable that although defendant told the detectives "four times" that he had "to talk to his parents," the detectives "completely disregarded his request[s]."  Moreover,

25

in addition to "want[ing] to talk to his parents about it," defendant was "tired" and "want[ed] to go home." The judge concluded that under the circumstances, "whether independently or as part of the statement taken, th[e] consent [to search] was not validly given."

On February 24, 2020, the State moved for leave to appeal the judge's February 4, 2020 decision. Thereafter, on March 17, 2020, the judge filed a written amplification of his reasons pursuant to Rule 2:5-1(b). In his amplification, the judge focused on why he concluded the State failed to prove that defendant expressly or implicitly waived his Miranda rights. Relying on State v. Tillery, 238 N.J. 293 (2019), the judge concluded "that the detectives did not necessarily exhibit an adherence towards honoring [defendant's] rights," but instead

> worked to their advantage the time he had been in custody since his arrest . . . , his unfamiliarity with the purpose and nature of the custodial environment within which he was placed into, and both the sincerity and naiveté behind his attempt to respond to their interrogation despite having no prior experience with the criminal justice system which, as [a] result, made him ill-equipped to appreciate what was going on.

Specifically, the judge stated he "had no issue" with the Miranda rights form presented to defendant by Detectives Tredo and Rodriguez. Instead, what the judge

26

found problematic was the manner in which Detective Tredo presented the Miranda form to [defendant] in advising him of his rights and subsequently securing a waiver of his rights, given the totality of the circumstances surrounding his arrest and how he came to be in . . . her presence for interrogation.

In that regard, the judge explained that the manner in which defendant's rights were administered

ostensibly, and incorrectly, [relegated] the Miranda inquiry into a simple administrative measure which was being addressed by Detective Tredo only because, as she described to [defendant], he was now being spoken to at the police station instead of the true purpose for his placement within that room, that being that he was being subjected to custodial interrogation aimed at obtaining incriminating statements concerning the allegations for which he was taken into custody. Detective Tredo's approach to the Miranda inquiry underscored the failure of the detectives to recognize what our [Supreme] Court has acknowledged for quite some time now: that the atmosphere of custodial interrogation is inherently coercive in nature, and that the proper administration of a suspect's Miranda rights will ensure that his right against self-incrimination will be protected.

Analogizing the facts to Tillery, the judge stated:

In this case, absent from the Miranda inquiry was any explanation by Detective Tredo to [defendant] concerning the precise purpose, meaning and significance of the waiver portion of the inquiry. Instead, Detective Tredo incorrectly advised [defendant] that having spoken to officers before the inquiry was made necessary because he was now at the

police station.  Failing to do more, Detective Tredo fell short of the optimal law enforcement practice concerning the question of waiver during a Miranda inquiry that, moving forward, the Court was hoping to achieve as a result of their decision in Tillery.

Addressing whether the State established an implicit waiver of Miranda rights on the part of defendant, the judge expounded:

> In some respects, the findings made in Tillery concerning the defendant's age, education and speaking ability in favor of an implied waiver apply here.  At the time of his interrogation, [defendant] was a [twenty-two-year-old] undergraduate student enrolled at Rutgers University and a member of the University's football team.  He spoke with Detectives Tredo and Detective Sergeant Rodriguez in a calm, fluent manner, attempting to be as responsive to their questions as best he could.  The transition from the Miranda inquiry (sans the inquiry on the question of waiver) into the interrogation was without delay.  However, [defendant] had no prior contact nor history, whatsoever, with the criminal justice system and cannot be said to have any background understanding as to the true purpose and nature of a custodial interrogation (i.e., that they had specific charges they were questioning him about and that he was not going to be allowed to go home at the end of the interrogation.)  This became evident by his questions and dialogue concerning the return of his cellphone during the interrogation and the uncertainties expressed by the officers concerning his release.  As the interrogation continued, certain verbal expressions and physical manifestations became more evident of the fatigue, frustration, agitation and/or discomfort beginning to overtake [defendant].

The judge reached the same result with respect to defendant's interaction with Officer Archibald:

> There can be little doubt that what was captured via the body camera recording illustrates a clear violation of <u>Miranda</u> principles. The manner in which the officers both corralled and contained [defendant] illustrated a clear intent by them to maintain custody of him, irrespective of Officer Archibald's qualifying statements, until his inevitable arrest and transport to police headquarters. Coupled with the seemingly perfunctory approach in which Officer Archibald attended to the <u>Miranda</u> inquiry, the State's suggestion that under these circumstances [defendant's] responses to questioning demonstrated an expressed or implied waiver of his <u>Miranda</u> rights was untenable.

Turning to the consent to search, the judge reasoned:

> On the question of consent presented by detectives to search [defendant's] cellphone and his vehicle, [defendant] deferred to his parents' authority and sought to consult with them first. Detectives first hesitated, then subsequently disregarded [defendant's] request and pressed him for consent advising him that his possession and use of both made him authorized to grant consent. What became disappointing to watch was the length of time, and the manner in which the detectives took to convince [defendant] to change his mind as they ultimately presented him with consent forms for review and signature. What then became ironic about their efforts to secure [defendant's] consent was that when Detective Tredo subsequently went over the "Consent to Search" form with him concerning his cellphone, the fifth right he was advised of was his right to "consult with anyone of [his] choosing before [he made] a decision to waive [his] rights . . ." and consent

29

to the search of the phone, a choice he had just made and which she had disregarded and dismissed.

## II.

In this ensuing appeal, the State raises the following single point for our consideration:

> THE TRIAL COURT'S ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND PHYSICAL EVIDENCE WAS ERRONEOUS AND MUST BE REVERSED.

When we review a trial court's decision on a suppression motion, "we generally defer to the factual findings of the motion court when they are supported by credible evidence in the record." State v. Sims, 466 N.J. Super. 346, 362 (App. Div. 2021). "[A] trial court's findings should be disturbed only if they are so clearly mistaken 'that the interests of justice demand intervention and correction.'" State v. A.M., 237 N.J. 384, 395 (2019) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). "Deference to a trial court's factual findings is appropriate 'because the trial court has the "opportunity to hear and see the witnesses and to have the feel of the case, which a reviewing court cannot enjoy."'" Sims, 466 N.J. Super. at 362-63 (quoting State v. S.S., 229 N.J. 360, 374 (2017)). "That standard governs appellate review even when the trial court's findings are premised on a recording or documentary evidence that the appellate

court may also review." Tillery, 238 N.J. at 314 (citing S.S., 229 N.J. at 380-81). However, "[t]o the extent that a trial court determination involved legal conclusions, we review those conclusions de novo." Ibid. See State v. Handy, 206 N.J. 39, 45 (2011) (noting that whether established facts warrant suppression is a "purely . . . legal question" subject to plenary review).

Turning to the governing principles of constitutional law pertinent to this appeal, "[t]he right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503." S.S., 229 N.J. at 381 (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). In Miranda, the United States Supreme Court "determined that a custodial interrogation by law enforcement officers is inherently coercive, automatically triggering the Fifth Amendment privilege against self-incrimination." P.Z., 152 N.J. at 102 (citing Miranda, 384 U.S. 436). As a result,

> when a person in police custody is questioned by law enforcement, he must be told that he has the right to remain silent, that any statement he makes may be used against him, that he has the right to an attorney, and that if he cannot afford an attorney, one will be provided for him.
>
> [Ibid. (citing Miranda, 384 U.S. at 444).]

"<u>Miranda</u> imposes a fifth requirement:  'that a person must be told that he can exercise his rights at any time during the interrogation.'"  <u>Tillery</u>, 238 N.J. at 315 (quoting <u>Miranda</u>, 384 U.S. at 479).  These procedural safeguards, commonly referred to as "<u>Miranda</u> warnings," <u>P.Z.</u>, 152 N.J. at 102, are intended "to secure the privilege against self-incrimination" and are required whenever custodial interrogation occurs.  <u>Miranda</u>, 384 U.S. at 444.

Custodial interrogation "mean[s] questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  <u>Ibid.</u>  "Thus, the protections provided by <u>Miranda</u> are only invoked when a person is both in custody and subjected to police interrogation."  <u>State v. Hubbard</u>, 222 N.J. 249, 266 (2015).  While federal law requires a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest," <u>California v. Beheler</u>,  463 U.S. 1121, 1125 (1983) (internal quotation marks omitted), "[o]ur courts have also recognized that custody in the <u>Miranda</u> sense does not necessitate a formal arrest, nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." <u>P.Z.</u>, 152 N.J. at 102-03 (internal quotation marks omitted).

"Whether a suspect has been placed in custody is fact-sensitive and sometimes not easily discernable." State v. Scott, 171 N.J. 343, 364 (2002). "The relevant inquiry is determined objectively, based on 'how a reasonable [person] in the suspect's position would have understood his situation,'" rather than "'on the subjective views harbored by either the interrogating officers or the person being questioned . . . .'" Hubbard, 222 N.J. at 267 (alteration in original) (first quoting Berkemer v. McCarty, 468 U.S. 420, 442 (1984); and then quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). Indeed, "[t]he critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103. See State v. Smith, 374 N.J. Super. 425, 431 (App. Div. 2005) (delineating relevant factors in evaluating custody as "the time, place and duration of the detention; the physical surroundings; the nature and degree of the pressure applied to detain the individual; language used by the officer; and objective indications that the person questioned is a suspect").

Once the defendant is subjected to custodial interrogation requiring the administration of Miranda rights, "[t]he defendant may waive effectuation of

[those] rights, provided the waiver is made voluntarily, knowingly, and intelligently." Miranda, 384 U.S. at 444. Under New Jersey law, "the State must 'prove beyond a reasonable doubt that the suspect's waiver was knowing, intelligent, and voluntary in light of all the circumstances.'" Tillery, 238 N.J. at 316 (quoting State v. Presha, 163 N.J. 304, 313 (2000)).

Our law "does not require that a defendant's Miranda waiver be explicitly stated in order to be effective." Id. at 316. Rather, "[a] waiver may be 'established even absent formal or express statements.'" A.M., 237 N.J. at 397 (quoting Berghuis v. Thompkins, 560 U.S. 370, 383 (2010)). "Indeed, '[a]ny clear manifestation of a desire to waive is sufficient.'" Tillery, 238 N.J. at 316 (alteration in original) (quoting State v. Hartley, 103 N.J. 252, 313 (1986)). See also Kevin G. Byrnes, N.J. Arrest, Search & Seizure § 28:2-1 (2019) (noting that under New Jersey law, "a waiver may be inferred from the particular factual circumstances following the proper administration of Miranda warnings to a suspect in custody").

"To determine the question of waiver, the trial court reviews 'the totality of the circumstances surrounding the custodial interrogation.'" Tillery, 238 N.J. at 316 (quoting A.M., 237 N.J. at 398). "The criterion is not solely the language employed but a combination of that articulation and the surrounding facts and

34

circumstances."  State v. Kremens, 52 N.J. 303, 311 (1968).  In soliciting a waiver, the interrogating officer must conduct a complete inquiry "to address the question of waiver in the Miranda inquiry."  Tillery, 238 N.J. at 318.  To that end, the interrogating officer should "ask whether the suspect understands his or her rights, and whether, understanding those rights, he or she is willing to answer questions."  Ibid.  Importantly, "[w]hen law enforcement officers request that a suspect sign a Miranda card or form, they should scrupulously avoid making comments that minimize the significance of the suspect's signature on that card or form."  Tillery, 238 N.J. at 319.  "Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent."  Berghuis, 560 U.S. at 384.

"There is substantial overlap between the factors that govern a court's determination of whether a Miranda waiver is valid and the factors that a court considers in its separate assessment of the voluntariness of a confession."  Tillery, 238 N.J. at 316-17.  "In the inquiry as to the validity of a waiver, '[f]actors commonly considered include the suspect's intelligence and education, age, familiarity with the criminal justice system, physical and mental condition, and drug and alcohol problems.'"  Id. at 317 (quoting Guide for Users:  I.

Investigations and Police Practices, 46 Geo. L.J. Ann. Rev. Crim. Proc. 3, 230-33 (2017)). "In addition, courts consider 'the explicitness of the waiver, language barriers, and the time lapse between the reading of Miranda rights and the actual questioning or incriminating oral statement.'" Ibid. (quoting Guide for Users: I. Investigations and Police Practices, 46 Geo. L.J. Ann. Rev. Crim. Proc. at 233-34 (footnotes omitted)).

Regardless of other factors, in Vincenty, 237 N.J. at 134, and A.G.D., 178 N.J. at 58-59, our Supreme Court determined that a defendant's waiver of Miranda rights is invalid unless the police inform the suspect that a criminal complaint or arrest warrant has been filed or issued and the basis for the complaint or warrant. Failure to do so deprives the suspect of "information indispensable to a knowing and intelligent waiver." State v. O'Neill, 193 N.J. 148, 179 (2007) (quoting A.G.D., 178 N.J. at 68). In Sims, we applied the requirements of A.G.D. and Vincenty to an arrested interrogee, holding that "[o]nce arrested, defendant was entitled to be informed of the charge for which he was being placed under arrest before deciding whether to waive his right against self-incrimination." Sims, 466 N.J. Super. at 367. We specified that the requirement arose "where an officer's probable cause to arrest is developed through an investigation," and we "recognize[d] that the charge may morph into

a different degree crime or even a totally different offense as a post-interrogation investigation develops." Id. at 368 n.6, 7.

Like waiver, "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968). "The burden of proof is on the State to establish by clear and positive testimony that the consent was so given." State v. Shaw, 237 N.J. 588, 618-19 (2019) (quoting State v. King, 44 N.J. 346, 352 (1965)). "To be voluntary[,] the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" King, 44 N.J. at 352 (quoting Judd v. United States, 190 F. 2d 649, 651 (D.C. Cir. 1951)). To satisfy that requirement, the State must prove "that the individual giving consent knew that he or she 'had a choice in the matter.'" State v. Hagans, 233 N.J. 30, 39 (2018) (quoting State v. Carty, 170 N.J. 632, 639, modified, 174 N.J. 351 (2002)). Thus, "the consenting party must know that he [or she] has the right to decline consent." State v. Birkenmeier, 185 N.J. 552, 563-64 (2006) (citing State v. Johnson, 68 N.J. 349, 353-54 (1975)).

"Consent is . . . a factual question to be determined from the relevant circumstances." State v. Koedatich, 112 N.J. 225, 264 (1988). In King, the

Court "delineated factors for use by our courts in considering the voluntariness of consent." Hagans, 233 N.J. at 39 (citing King, 44 N.J. at 352-53). Generally,

> [f]actors potentially indicating coerced consent include:
>
> > (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> Factors potentially indicating voluntariness of consent include:
>
> > (1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers.
>
> [Id. at 39-40 (quoting King, 44 N.J. at 352-53).]

"[M]any decisions have sustained a finding that consent was voluntarily given even though the consent was obtained under the authority of the badge or after the accused had been arrested." King, 44 N.J. at 353. "Voluntariness depends on 'the totality of the particular circumstances of the case' with each

case 'necessarily depend[ing] upon its own facts.'" Hagans, 233 N.J. at 40 (alteration in original) (quoting King, 44 N.J. at 353). "Because determining 'whether consent was voluntarily given is a factual issue,' it is 'to be decided by the trial judge; and the appellate court should reverse only when it finds that determination to be clearly erroneous.'" State v. Williams, 461 N.J. Super. 80, 103-04 (App. Div. 2019) (quoting King, 44 N.J. at 354 (emphasis omitted)).

Applying these principles here, first, we are satisfied the State failed to meet its burden of proving a valid waiver of defendant's Miranda rights. We agree with the judge that based on the objective circumstances, defendant was subjected to custodial interrogation during his interaction with Officer Archibald, requiring the administration of Miranda warnings. Thus, the incriminating responses elicited prior to the administration of the warnings were properly suppressed.

We also agree that the incriminating statement elicited after the administration of the warnings was properly suppressed because there was no valid waiver. After advising defendant of his rights, Archibald never asked defendant if he wished to waive his rights and speak to the police. Thus, Archibald never ensured that defendant had waived his rights before questioning began and thereby conducted "an incomplete inquiry on the question of waiver."

<u>Tillery</u>, 238 N.J. at 318. Moreover, "[b]ecause the [police] gave <u>Miranda</u> warnings midstream and did not mention the inadmissibility of his prior incriminating statements, defendant lacked sufficient information needed to make a knowing, voluntary, and intelligent waiver of the privilege." <u>O'Neill</u>, 193 N.J. at 183.

Another factor weighing against a finding of an express or implied waiver was Archibald's statement to defendant prior to advising him of his rights that defendant was "not under arrest" and "not in trouble," thus undermining the efficacy of the administration of the warnings and defendant's ability to make a knowing, voluntary, and intelligent waiver of the privilege. <u>See</u> <u>Tillery</u>, 238 N.J. at 319. We therefore agree that the totality of the circumstances supports the judge's finding that there was no valid waiver with respect to defendant's statement to Archibald.

Regarding defendant's statements to Tredo and Rodriguez, the judge was convinced that merely having defendant read and sign the waiver form, without asking him whether he was willing to waive his rights and answer questions before proceeding with questioning, ran afoul of <u>Tillery</u>. In <u>Tillery</u>, the Court determined that the <u>Miranda</u> card used by law enforcement did not "reflect

optimal law-enforcement practice." Id. at 318. Although "[t]he card accurately recited a suspect's Miranda rights," the waiver of Miranda rights section was

> a sentence advising a suspect that his or her decision to waive those rights is not final and may be withdrawn. It did not guide an interrogating officer, however, to ensure that the suspect had waived those rights before questioning began. Instead, the card ambiguously stated that by signing, the suspect acknowledged that he or she had been "advised of the constitutional rights found on the reverse side of this card." In short, the Miranda card used in this case invited an incomplete inquiry on the question of waiver.
>
> [Id. at 318.]

The deficiency was compounded by the fact that

> the advice that [the detective] gave defendant as to the purpose of his signature on the Miranda card was incomplete. Perhaps misled by the language of the Miranda card, the detective told defendant that by signing the card, he would simply acknowledge that his Miranda rights had been read to him. He urged defendant to "[j]ust sign here that I read you your rights."
>
> [Id. at 319.]

Here, the deficiency in the Miranda form referenced by the Tillery Court and the comments by the detective minimizing the significance of the suspect's signature on the form are not present. In any event, we need not decide whether Detectives Tredo and Rodriguez properly "address[ed] the question of waiver in

the <u>Miranda</u> inquiry," <u>id.</u> at 318, because we are satisfied that their failure to inform defendant of the charges for which he was being placed under arrest was fatal to eliciting a valid waiver. <u>See</u> <u>Sims</u>, 466 N.J. Super. at 367.

In that regard, it is undisputed that Tredo had probable cause to arrest defendant through her pre-interrogation investigation. Further, defendant's detention at police headquarters for several hours and the degree of intrusion upon his liberty clearly established a de facto arrest. <u>See</u> <u>State v. Dickey</u>, 152 N.J. 468, 478-79 (1998) (noting that a de facto arrest is lawful only if supported by probable cause, and delineating factors that weigh in favor of a de facto arrest, including the duration of the detention, the degree of fear and humiliation that the police conduct engenders, transportation of the detained person to another location, and isolation or confinement of the person). Notably, defendant was repeatedly told by the detectives that he was not free to leave. It was therefore incumbent upon both detectives to inform defendant of the charges for which he was subjected to a de facto arrest during their administration of <u>Miranda</u> warnings even if those charges would morph into totally different charges as a post-interrogation investigation developed. <u>See</u> <u>Sims</u>, 466 N.J. Super. at 368 n.7. Failure to do so deprived defendant of "information

42

indispensable to a knowing and intelligent waiver." O'Neill, 193 N.J. at 179 (quoting A.G.D., 178 N.J. at 68).

The other factors cited by the judge in the "totality of the circumstances" inquiry, particularly the fact that defendant had no prior contact with the criminal justice system and expected to go home at the end of the interrogation, also support the conclusion that there was no valid waiver. Defendant's inexperience with the criminal justice system was palpably demonstrated when he queried hours after making incriminating statements "[s]o, I can go to jail for making comments[?]" As the A.G.D. Court stated, "[w]ithout advising the suspect of his true status when he does not otherwise know it, the State cannot sustain its burden to the Court's satisfaction that the suspect has exercised an informed waiver of rights, regardless of other factors that might support his confession's admission." 178 N.J. at 68.

Turning next to the consent to search, there is no question that defendant repeatedly indicated that he wanted to consult with his parents before making a decision. However, the record also reflects both Tredo and Rodriguez specifically telling defendant that they were not "forcing" him to consent. Rodriguez offered to give defendant more time to consider his decision and Tredo confirmed that defendant had the option to contact his parents first. Tredo

43

thoroughly and accurately explained to defendant his rights concerning consent to search[7] and defendant asked questions for clarification about certain aspects of the form. The detectives were responsive to defendant's questions and he confirmed that he understood his rights prior to signing both forms. In our view, while persistent, the detectives were not menacing, harassing, or deceptive. See Hagans, 233 N.J. at 33 (finding "a driver's consent to search her automobile after she initially denied a police officer's request to search it" valid). In the totality of the circumstances, while we defer to the judge's factual findings, we disagree with the judge's legal conclusion that defendant's consent was coerced. On the contrary, applying the King factors, particularly those factors indicating voluntariness of consent, we are satisfied that the State sustained its burden of proof and established that defendant's consent was knowingly and voluntarily given.

However, we remand to the trial court to determine whether the evidence seized from the search of the car and the phone should also be suppressed "as 'fruit of the poisonous tree' derived from the illegal interrogation, or admitted

---

[7] The detectives correctly informed defendant that he was allowed to consent to a search of the phone and the car because he was the primary operator. See State v. Coles, 218 N.J. 322, 340 (2014) ("Our state law on consent searches . . . has recognized a third party's ability to consent to a search when the consenter has common authority for most purposes over the searched space.").

A-2827-19

into evidence despite the taint." Sims, 466 N.J. Super. at 369; see, e.g., State v. Maltese, 222 N.J. 525, 551-52 (2015) (remanding for the trial court to determine whether evidence "discovered directly" from the defendant's illegally obtained confession should be suppressed pursuant to the exclusionary rule); O'Neill, 193 N.J. at 171 n.13 ("The fruit-of-the-poisonous-tree doctrine denies the prosecution the use of derivative evidence obtained as a result of a Fourth or Fifth Amendment violation."); State v. Sugar, 100 N.J. 214, 238 (1985) (allowing an exception to the exclusionary rule where "proper, normal and specific investigatory procedures would have been pursued in order to complete the investigation of the case; . . . pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and . . . discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means"). Here, "[w]ithout a sufficiently developed record, we decline to review these issues . . . ." Shaw, 237 N.J. at 622.

Affirmed in part, reversed and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION